UNITED STATES, Appellee,

v.

Sergeant Chad D. BENNER, United
States Army, Appellant.

ARMY 9801777.

U.S. Army Court of Criminal Appeals.

5 July 2001.

For Appellant: Frank Spinner (argued);
Colonel Adele H. Odegard, JA; Major Jonathan F. Potter, JA; Captain Marc D.A. Cipriano, JA; Captain Daniel E. Goldman, JA
(on brief); Captain Katherine A. Lehmann,
JA.

For Appellee: Captain Arthur L. Rabin,
JA (argued); Colonel David L. Hayden, JA;
Lieutenant Colonel Edith M. Rob, JA; Major
Anthony P. Nicastro, JA (on brief).

Before MARCHAND, Chief Judge,
TOOMEY, Senior Judge, and HARVEY,
Appellate Military Judge.

OPINION OF THE COURT

MARCHAND, Chief Judge:

A military judge sitting as a general court-martial convicted appellant, pursuant to his
pleas, of sodomy with a child and indecent
acts with a child, in violation of Articles 125
and 134, Uniform Code of Military Justice, 10
U.S.C. §§ 925 and 934 [hereinafter UCMJ].
The military judge sentenced appellant to

reduction to Private E1, forfeiture of all pay and allowances, confinement for six years, and a dishonorable discharge. The convening authority reduced the sentence to confinement to five years pursuant to appellant's pretrial agreement, and approved the remainder of the adjudged sentence. The convening authority deferred adjudged forfeitures, waived automatic forfeitures until the date of action, and ordered payment of waived forfeitures to appellant's spouse for the benefit of appellant's daughter.

This case is before the court for mandatory review pursuant to Article 66, UCMJ, 10 U.S.C. § 866. In addition to the record of trial and the parties' briefs, we have considered the oral argument of both counsel. Appellant filed two assignments of error. First, appellant asserts that the military judge erred by denying a motion to suppress his confession that was made prior to his conditional guilty plea.[1] Appellant alleges that his confession to a special agent (SA) from the United States Army Criminal Investigation Command (CID) was involuntary because Chaplain (Captain) S erroneously told appellant that, unless appellant disclosed his "improper relationship" with his stepdaughter to law enforcement, Chaplain S would be required to disclose it. Appellant argues that Chaplain S "was effectively acting in a law enforcement capacity" when he told appellant that he had a duty to report, and that appellant had no choice but to divulge his misconduct to CID because "the cat was out of the bag." In his second assignment of error, appellant asserts that he suffered cruel and unusual punishment at the hands of a guard at the United States Army Confinement Facility, Europe (USACFE), who repeatedly physically abused and harassed appellant, in violation of the Eighth Amendment to the United States Constitution [hereinafter Eighth Amendment] and Article 55, UCMJ, 10 U.S.C. § 855. The government contests the first issue but concedes the second. We find that the military judge correctly declined to suppress appellant's confession and that appellant is entitled to relief for post-

trial violations of the Eighth Amendment and Article 55, UCMJ.

## Suppression of Appellant's Confession

### Facts

The misconduct that led to appellant's convictions is not in dispute. While appellant's wife was hospitalized in May 1998, appellant committed indecent acts with and sodomized his four-year old stepdaughter, M, in his quarters in Babenhausen, Germany.

In June 1998, M told appellant's mother-in-law, who was visiting appellant's family, about appellant's sexual abuse. Shortly after appellant's wife was released from the hospital, M disclosed to her mother what appellant had done to her. Appellant's wife later confronted appellant concerning M's allegations, and appellant admitted that M's allegations were true. Appellant's mother-in-law took M to her home in Oklahoma in August 1998. Neither appellant's wife nor mother-in-law reported appellant's misconduct to law enforcement personnel prior to being contacted by CID agents on 23 September 1998.

On 20 September 1998, a Sunday, at about 2000, appellant called Chaplain S and arranged to meet him at his office in the chapel building. Appellant wanted to meet with Chaplain S because his wife had left him and he felt shame and guilt for what he had done to M. When appellant arrived at the chapel, Chaplain S noticed that he was "quite burdened about something." In response to Chaplain S's question about what was going on, appellant began to sob and stated that he had engaged in an improper relationship with his stepdaughter. Appellant did not relate any specific details of this improper relationship. After appellant's admission, Chaplain S and appellant discussed the issue of forgiveness and appellant's "feelings of guilt [and] remorse." At the end of their conversation, Chaplain S told appellant that he might have an obligation to report appellant's child abuse. Chaplain S made an appointment for appellant to return the following

1. Pursuant to Rule for Courts–Martial [hereinafter R.C.M.] 910(a)(2), appellant and the convening authority agreed to allow appellant to preserve for appellate review the issue of the admissibility of his confession. *See also* Military Rule of Evidence [hereinafter Mil.R.Evid.] 304(d)(5); *United States v. Tarleton,* 47 M.J. 170, 173 (1997).

day to discuss the misconduct and whether Chaplain S was required to report it.

On 21 September 1998, prior to his meeting with appellant, Chaplain S telephoned an employee of the Army Family Advocacy office who mistakenly told him that he had an obligation to report appellant's abuse to law enforcement. A few minutes later, Chaplain S met with appellant in an office in the chapel building and explained that he had an obligation to report appellant's improper relationship with his stepdaughter. Appellant then provided some of the specifics concerning his abuse of his stepdaughter. Chaplain S told appellant that it would be better for appellant to confess to the authorities on his own accord, and offered to go with him to the military police (MP) station. They discussed "the issue of forgiveness, of forgiving himself, [and] that [confessing] may be a step in helping him deal with that," as well as available counseling services.

Appellant "was reluctant at first" to go to the MP station, and Chaplain S doubted that appellant "would have gone immediately and made the report himself if [Chaplain S] had not volunteered to go with him." Chaplain S did not order, threaten, or forcibly take appellant to the MP station. As appellant and Chaplain S walked to the MP station, which was about 100 yards from the chapel, Chaplain S told appellant that he knew Sergeant First Class (SFC) K, the commander of the MP station, and that he would explain to SFC K why they were there. Appellant neither objected nor expressly consented to Chaplain S's disclosure of information to SFC K. Chaplain S perceived his role as providing spiritual and moral support to appellant.

Once they arrived at the MP station, Chaplain S informed SFC K that appellant wanted to make a statement about an improper relationship with his stepdaughter that occurred while appellant's wife was in the hospital and appellant had been drinking alcohol. Chaplain S did not provide any other details of appellant's misconduct to SFC K. Sergeant First Class K told Chaplain S that a CID representative from Darmstadt, Germany, would take appellant's statement. Chaplain S told appellant what

was happening, offered to meet with him after he talked to CID, waited with appellant for approximately ten more minutes, and then departed the MP station.

Special Agents B and L arrived in Babenhausen about an hour after SFC K contacted SA B. Neither SA B nor L spoke with Chaplain S before interviewing appellant. After discussing preliminary matters, SA B advised appellant of his Fifth Amendment, Article 31(b), UCMJ, 10 U.S.C. § 831(b), and Mil.R.Evid. 305(d) rights, which included notification that appellant was suspected of committing an indecent assault. Appellant voluntarily waived his rights and made a seven-page, hand-written confession. When asked why he was coming forward to report his misconduct, appellant stated in his written confession:

> My wife and I discussed that I would get help but I didn't know who to talk to. My wife is uncertain that our daughter will [accept] me back and is thinking about leaving me. The burden of what I did and her being gone was [too] much pressure for me.

Appellant also stated in his confession that he, his wife, and his mother-in-law agreed that he would get professional help, and that on 20 September 1998 he "finally broke down" and talked to a chaplain about the abuse.

At an Article 39(a), UCMJ, suppression hearing, appellant said that he decided to waive his rights and make a statement to CID because he had already told Chaplain S about his abuse of M, and he believed that Chaplain S "was going to tell or [he] had to." The CID agents never asked appellant about his earlier admissions to a chaplain or called upon him to admit the offenses because he had already admitted them to a chaplain. The military judge denied appellant's motion to suppress, concluding that appellant's confession to CID "was not the result of improper influence or coercion."

### Discussion

■ While a military judge's evidentiary ruling is generally reviewed under an abuse of discretion standard, "a ruling that a statement was made voluntarily may present a

question of law which this Court may review *de novo.*" *United States v. Ruiz,* 54 M.J. 138, 140 (2000); *see also United States v. Washington,* 46 M.J. 477, 481–82 (1997); *United States v. Martinez,* 38 M.J. 82, 86 (C.M.A.1993). "An appellate court reviews the denial of a motion to suppress a confession under an abuse of discretion standard, and accepts the judge's findings of fact unless they are clearly erroneous." *United States v. Simpson,* 54 M.J. 281, 283 (2000) (citations omitted).

We agree with the military judge's findings that appellant's statements to Chaplain S about his sexual abuse of M were made as a matter of conscience, and that Chaplain S was acting as appellant's spiritual advisor. Exercising our Article 66(c), UCMJ, authority, we further find that appellant intended that Chaplain S would keep appellant's initial statement about his improper relationship with M confidential.[2] We also agree with the military judge's finding that any breach[3] of the clergy privilege was minor, and that appellant had sufficient time between such breach and his CID interview to consider his actions and make a voluntary decision whether to make a statement to CID. Appellant's confession was a voluntary product of his free will.

The Supreme Court has "recognize[d] the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), *quoted in Napoleon,* 46 M.J. at 285. Although there is no specific Federal Rule of Evidence providing for a clergy privilege, the existence of the federal clergy privilege based upon federal common law is well established. *See In re Grand Jury Investigation,* 918 F.2d 374, 377 (3d Cir.1990) (discussing historical background of clergy privilege and noting background for a proposed Federal Rule of Evidence "protecting communications to members of the clergy."). The Army's recognition of the clergy privilege substantially predates the Military Rules of Evidence. *See* Captain Michael J. Davidson, *The Clergy Privilege,* Army Law., Aug. 1992, at 19 n.35 (noting that in 1917, while not recognized by the Manual for Courts–Martial, Army Regulations formally recognized the chaplain privilege). The benefits of the military clergy privilege are critical to the effectiveness of our chaplains because the privilege allows military chaplains to develop and keep the trust of those they serve. *Isham,* 48 M.J. at 607. Because the clergy privilege acts to exclude evidence, it, like other testimonial privileges, "must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Trammel,* 445 U.S. at 50, 100 S.Ct. 906 (citations omitted).

Appellant correctly asserts that Chaplain S's disclosure to SFC K that appellant had an improper relationship with his stepdaughter failed to comply with paragraph 4–4(m) of Army Regulation [hereinafter AR] 165–1, Chaplain Activities in the United States Army (27 Feb. 1998), because this disclosure of clergy-penitent communications occurred without appellant's prior *written* consent. Chaplain S also provided advice to appellant that was inconsistent with paragraph E–5 of AR 608–18, The Army Family Advocacy Pro-

---

**2.** Appellant had a privilege to prevent Chaplain S from disclosing this information. *See* Mil. R.Evid. 503; *United States v. Napoleon,* 46 M.J. 279, 284 (1997); *United States v. Isham,* 48 M.J. 603, 605 (N.M.Ct.Crim.App.1998); *United States v. Moreno,* 20 M.J. 623, 625 (A.C.M.R.1985).

**3.** Appellant's failure to object to Chaplain S's disclosure to SFC K about appellant's improper relationship with his stepdaughter was based at least in part upon Chaplain S's erroneous advice to appellant that he had a duty to disclose their conversations about the inappropriate relation-

ship. Appellant's consent, if any, to Chaplain S's disclosure is invalid because he did not waive or intentionally relinquish a "known right." *See* Stephen A. Saltzburg et al., *Military Rules of Evidence Manual,* at 694 (4th ed.1997) (citing *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)) (discussing Mil.R.Evid. 510); *see also United States v. Hayes,* 227 F.3d 578, 586 (6th Cir.2000) (holding that a knowing and voluntary waiver of the psychotherapist-patient privilege cannot be based on inaccurate information about the limits of confidentiality).

gram (1 Sep. 1995), which indicates that clergy working for the military have no obligation to report child abuse that comes to their attention through privileged communications. Chaplain S's failure to obtain appellant's written consent, however, is irrelevant to the admissibility of appellant's confession to CID. Our superior court has indicated that creation of exclusionary rules by "directives not issued by the President and not contained in the Manual seems inconsistent with Article 36[, UCMJ, 10 U.S.C. § 836]." *United States v. Nadel*, 48 M.J. 485, 488 (1998). Military Rule of Evidence 501(a) does not permit the creation of evidentiary privileges by Army Regulation. We find that ARs 165-1 and 608-18 do not expressly provide for any remedy for failure to comply with their provisions, and that these Army regulations do not confer a greater right or remedy to soldiers beyond that required by Mil.R.Evid. 503. *See generally Nadel*, 48 M.J. at 488; *United States v. Wooten*, 34 M.J. 141, 146 (C.M.A.1992) (holding that the civil remedies under the Right to Financial Privacy Act were exclusive and did not provide for the suppression of evidence obtained in violation of the Act).

Appellant's analogy to Fourth Amendment case law [4] indicating a lack of voluntary consent after "being threatened with a 'command-directed' urinalysis" is inapposite. Consent is not valid unless "freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Whether consent is voluntarily given "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (enumerating a list of factors for determining the voluntariness of confessions and applying these factors to consent searches); *see also United States v. Radvansky*, 45 M.J. 226, 229-31 (1996) (rejecting a "bright-line" rule that mere mention of a command-directed search creates a presumption of involuntariness in favor of a totality of circumstances analysis); Mil.R.Evid. 314(e)(4). Our superior court has declined to apply a per se or "but for" rule to exclude confessions alleged

to be caused by Fourth Amendment violations, *see United States v. Williams*, 35 M.J. 323, 328 (C.M.A.1992), and we decline to apply such a rule in this case. The fact that appellant was unintentionally misled by Chaplain S is not dispositive because, even though appellant may have based his decision to cooperate on legally incorrect information, Chaplain S's incorrect advice by itself does not amount to coercion. *Compare United States v. Vassar*, 52 M.J. 9, 12 (1999) (holding that an accused's consent to a urinalysis test requested under the pretext of concern over his recently sustained head injury was voluntary), and *United States v. Richter*, 51 M.J. 213, 219-21 (1999) (holding that a false statement by the accused's friend, who was acting on behalf of law enforcement, that law enforcement had a search warrant did not render a subsequent consent to search involuntary), with *United States v. Salazar*, 44 M.J. 464, 468-69 (1996) (concluding that an MP's false statement to an accused's spouse that accused wanted contraband delivered to the MP station could render involuntary his spouse's subsequent delivery of contraband to the MP station).

We also disagree with appellant's contention that Chaplain S was effectively acting in a law enforcement or disciplinary capacity when he told appellant that he had a duty to report appellant's misconduct. Chaplain S was not in appellant's chain of command or supervisory chain, nor was he routinely involved in law enforcement duties. Chaplain S's primary function was to address appellant's spiritual needs. His spiritual assistance continued after appellant confessed to CID. Accordingly, Chaplain S was not required to warn appellant of his Fifth Amendment, Article 31(b), UCMJ, and Mil.R.Evid. 305(d) rights. *See United States v. Swift*, 53 M.J. 439, 446 (2000) (holding that rights warnings are required when "the person conducting the questioning is participating in an official law enforcement or disciplinary investigation or inquiry"), *cert. denied*, — U.S. —, 121 S.Ct. 1093, 148 L.Ed.2d 966 (2001).

---

4. Appellant cites *United States v. McClain*, 31 M.J. 130 (C.M.A.1990) and *United States v. White*, 27 M.J. 264 (C.M.A.1988), to support his Fourth Amendment analogy.

Like the trial judge, we reject the appellant's contention that his confession was involuntary because, "but for" Chaplain S's threat to disclose appellant's communication, he would not have confessed to CID. "[C]ausation in that sense has never been the test of voluntariness." *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976) (citing *Brady v. United States,* 397 U.S. 742, 749–50, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)).

Under military law, "an involuntary statement or any derivative evidence therefrom may not be received in evidence." Mil. R.Evid. 304(a). "A statement is 'involuntary' if it is obtained ... through the use of coercion, unlawful influence, or unlawful inducement." Mil.R.Evid. 304(c)(3); *see also* UCMJ art. 31(d). Derivative evidence may be admitted if "the statement was made voluntarily" or "the evidence was not obtained by use of the statement." Mil.R.Evid. 304(e)(3). In *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the defendant gave an incriminating answer in response to police questioning before being read his *Miranda* [5] rights. *Id.* at 301, 105 S.Ct. 1285. Approximately one hour later, the defendant was given full *Miranda* warnings, waived his rights, and confessed. *Id.* The Supreme Court, holding that the second, warned confession was voluntary and admissible, stated:

We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Id.* at 314, 105 S.Ct. 1285. The Court noted that the Fifth Amendment is not concerned with "moral and psychological pressures to confess emanating from sources other than

official coercion," such as a prior failure to provide *Miranda* warnings. *Id.* at 304–05, 105 S.Ct. 1285. The Supreme Court declined to apply a "but for" test and rejected the contention that the second confession was inadmissible under a "cat-out-of-the-bag" theory. *Id.* at 311, 105 S.Ct. 1285, *cited in United States v. Murphy,* 39 M.J. 486, 488 (C.M.A.1994). The Supreme Court noted that any psychological compulsion from the unwarned statement was too speculative and attenuated to cause a subsequent confession to be involuntary:

This Court has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver. The Oregon court, by adopting this expansive view of Fifth Amendment compulsion, effectively immunizes a suspect who responds to pre-*Miranda* warning questions from the consequences of his subsequent informed waiver of the privilege of remaining silent. . . .

There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a "guilty secret" freely given in response to an unwarned but noncoercive question, as in this case. . . . Certainly, in respondent's case, the causal connection between any psychological disadvantage created by his admission and his ultimate decision to cooperate is speculative and attenuated at best.

*Id.* at 312–14, 105 S.Ct. 1285 (citations omitted); *see also Murphy,* 39 M.J. at 488. Military courts have adopted and applied a similar *Elstad* analysis in deciding cases involving the voluntariness of confessions when rights warnings are not initially read to military accused. *See United States v. Ford,* 51 M.J. 445, 450–52 (1999); *United States v. Phillips,* 32 M.J. 76, 79–81 (C.M.A. 1991); *United States v. Steward,* 31 M.J. 259, 264–66 (C.M.A.1990), *aff'd on reh'g,* 35 M.J. 218 (C.M.A.1992); *see also* Mil.R.Evid. 304(e)(3).

---

**5.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct.     1602, 16 L.Ed.2d 694 (1966).

Several state cases have discussed the interplay between violations of non-constitutionally based evidentiary privileges and the voluntariness of subsequent confessions. In *State v. Smith,* 307 N.J.Super. 1, 704 A.2d 73 (Ct.App.Div.1997), the court applied *Elstad* and related cases when it held that, in the absence of police misconduct, a confession made as a result of a violation of the physician-patient privilege is not involuntary and should not be suppressed. *Id.* at 78–80. The court specifically found that the police "in no way violated defendant's privileged communication," and held that "[t]o punish the police, and the public, for unlawful actions of private citizens would be an unwarranted extension of the exclusionary principles applicable to involuntary confessions." *Id.* at 80; *see also Walstad v. State,* 818 P.2d 695, 699 n. 6 (Alaska Ct.App.1991) (noting "considerable doubt as to the extent to which the fruits of the poisonous tree doctrine should apply in cases involving violations of evidentiary privileges"); *People v. Burnidge,* 178 Ill.2d 429, 227 Ill.Dec. 331, 687 N.E.2d 813, 819 (1997) (Freeman, C.J., specially concurring) (commenting that the "fruits of the poisonous tree" doctrine should not be extended to violations of the clergy privilege, because "application of the [doctrine] in other than illegal police conduct cases is wholly inconsistent with the purpose of the exception[, which is] deterring police misconduct"); *People v. Ward,* 199 A.D.2d 573, 604 N.Y.S.2d 320 (1993) (holding that a murder confession obtained as a result of a violation of the clergy privilege was nevertheless voluntary, and was not the "fruit of the poisonous tree"). *Cf. Elstad,* 470 U.S. at 306, 105 S.Ct. 1285 ("[A] procedural *Miranda* violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the 'fruits' doctrine."). In appellant's case, because there was no evidence of police misconduct or evidence that CID used appellant's privileged communications with Chaplain S to coerce appellant's statement, there were no poisonous fruits to exclude. Nevertheless, having found that appellant's confession is not inadmissible as fruit of the poisonous tree, this court must still test appellant's confession for voluntariness.

The voluntariness of a confession is determined by the totality of the circumstances. *United States v. Loving,* 41 M.J. 213, 243 (1994), *aff'd,* 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996). " '[T]he totality of all the surrounding circumstances' includes 'both the characteristics of the accused and the details of the interrogation.' " *Ford,* 51 M.J. at 451 (quoting *Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041).

The characteristics of the appellant do not support suppression of his confession. He was a 25–year–old high school graduate who entered the Army in 1991, was promoted to Sergeant in 1996, and had a General Technical (GT) test score of 105. Appellant made a series of decisions indicating his intent to voluntarily disclose what he had done to his stepdaughter: (1) he confessed to his wife; (2) he sought out Chaplain S; (3) he provided specific details of his sexual abuse of M to Chaplain S after being advised that it would be reported to law enforcement; (4) he went to the MP station with Chaplain S without verbal objection; (5) he did not object to Chaplain S's disclosure to SFC K about his improper relationship with M; and (6) he waited for approximately forty-five minutes after Chaplain S departed the MP station for CID to arrive, without any restraints on his ability to leave. When appellant decided to confess to CID, he knew that he did not have to make a statement and that he had a right to a lawyer. He even hesitated while contemplating his right to counsel, indicating that his waiver of his right to counsel was a thoughtful and deliberate decision. Appellant was of sufficient intelligence and experience to understand and voluntarily waive his rights.

The details of the CID interrogation also do not support suppression of appellant's confession. The CID agents did not speak to Chaplain S before appellant provided his confession to them. The CID agents' discussion with SFC K was brief, from which they gathered general information that appellant wanted to make a statement about a sexual assault. The CID agents fully apprised appellant of his rights, and they did not use appellant's privileged statements to Chaplain S to urge or coerce appellant into waiving his

rights and confessing. *See United States v. Norfleet*, 36 M.J. 129, 131–32 (C.M.A.1992) (holding that any taint between the accused's unwarned statement to a social worker and his subsequent, warned confession was dissipated, in part, by the lack of law enforcement exploitation of the prior admissions and a proper rights warning at the start of the interview). Nor were the CID agents required to explain the application of the clergy privilege to appellant or to provide a cleansing warning. *See generally Moran v. Burbine*, 475 U.S. 412, 423–24, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (holding that the defendant's confession was not involuntary because the police failed to inform him that an attorney tried to talk to him during the interrogation, concluding that such conduct "is only relevant to . . . a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."). Appellant made a thorough, seven-page, handwritten, sworn confession. Nowhere in his confession did appellant allege that he was under duress or that his statement was involuntary in nature. To the contrary, appellant stated that he was coming forward because of discussions he and his wife had concerning his need for help, his stepdaughter's rejection of him, and his wife's thoughts

of permanently leaving him. When appellant's wife questioned him, he voluntarily confessed to her.[6] Appellant then voluntarily confessed the details of his sexual misconduct to Chaplain S, after Chaplain S told appellant that he had a duty to disclose his conduct to law enforcement. Appellant's confession to CID was consistent with his previous statements to his wife and Chaplain S.

█ Any violation of the military clergy privilege in this case did not taint appellant's confession to CID. A violation of the military clergy privilege, unlike the lawyer-client privilege (Mil.R.Evid. 502), does not necessarily have constitutional or statutory implications.[7] Therefore, a violation of the military clergy privilege does not warrant exclusion of derivative evidence under the fruit of the poisonous tree doctrine.[8] Applying *Elstad* and its progeny, we find that appellant's belief that Chaplain S would disclose that he had an inappropriate relationship with his stepdaughter and Chaplain S's failure to comply with AR 165–1 did not, under the totality of the circumstances, render appellant's confession to CID involuntary.

### Conclusion

█ We in no way condone Chaplain S's erroneous declaration to appellant that

---

**6.** Because appellant is "charged with a crime against . . . a child of [his spouse]," his admission to his wife is not protected by the husband-wife privilege. Mil.R.Evid. 504(c)(2)(A).

**7.** The military clergy privilege is based upon Mil. R.Evid. 503, not the United States Constitution or statute. *See generally United States v. Rodriguez*, 54 M.J. 156, 160 (2000) (noting that the military psychotherapist-patient privilege is based upon Mil.R.Evid. 513, and is not based on the United States Constitution or statute), *cert. denied*, —— U.S. ——, 121 S.Ct. 1094, 148 L.Ed.2d 967 (2001).

**8.** Appellant urged us during oral argument to reinforce the clergy privilege by excluding any evidence tainted by Chaplain S's violation of the clergy privilege, citing the strong protections accorded to the military attorney-client privilege. *See generally United States v. Ankeny*, 30 M.J. 10, 14–17 (C.M.A.1990) (excluding evidence derived from an improper disclosure of privileged attorney-client information because statements were "made in the course of plea discussions" and exclusion supports "the statutory right to counsel established in Article 38(b)," and is in alliance

with "comparative Sixth Amendment precedent from the Supreme Court"). Appellant's case is distinguishable from *Ankeny*, and suppression of his confession is not required under Mil.R.Evid. 410 or 511, because appellant's statements to Chaplain S were not made in the course of plea discussions and in no way implicated his statutory right to counsel. "[N]o court has ever applied the [fruit-of-the-poisonous-tree] theory to any evidentiary privilege." *United States v. Squillacote*, 221 F.3d 542, 560 (4th Cir.2000) (quoting *United States v. Marashi*, 913 F.2d 724, 731 (9th Cir. 1990)), *cert. denied*, —— U.S. ——, 121 S.Ct. 1601, 149 L.Ed.2d 468 (2001); *but cf., Weatherford v. Bursey*, 429 U.S. 545, 554, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) (stating that a government intrusion into the attorney-client privilege may result in a constitutional violation and exclusion of derivative evidence at trial). Unauthorized disclosure of attorney-client privileged information may result in exclusion of derivative evidence at trial " 'to prevent the forced disclosure in a judicial proceeding of certain confidential communications between a client and a lawyer.' " *Wharton v. Calderon*, 127 F.3d 1201, 1205 (9th Cir.1997) (quoting *United States v. Rogers*, 751 F.2d 1074, 1077 (9th Cir.1985)).

Chaplain S had a duty to disclose appellant's sexual abuse to authorities, or Chaplain S's disclosure of confidential communications to SFC K without prior written consent. We encourage chaplains to consult their superiors and legal advisors before divulging confidential communications. Nevertheless, admission of appellant's confession did not violate Mil. R.Evid. 503 because disciplinary or investigative authorities did not seek or otherwise cause Chaplain S to release confidential information, and because Chaplain S's testimony about appellant's misconduct was not admitted into evidence on the merits. Appellant's confession to Chaplain S was voluntary. Moreover, any taint from Chaplain S's erroneous statement to appellant that he had a duty to disclose his misconduct to law enforcement, and from Chaplain S's disclosure to SFC K, was removed when the CID agents read appellant his Fifth Amendment, Article 31(b), UCMJ, and Mil.R.Evid. 305(d) rights, and appellant waived them. Therefore, the military judge properly denied appellant's motion to suppress his confession.

### Cruel and Unusual Punishment

Appellant's second allegation is similar to one made in a recent series of cases arising out of guard misconduct at the USACFE in Mannheim, Germany. Appellant asserts in an affidavit that he entered the USACFE on or about 15 December 1998 and remained there until May 1999, when he was transferred to another confinement facility. Appellant alleges that Sergeant (SGT) D, a guard at the USACFE, victimized him on at least three specific occasions.

First, in the presence of fifteen other inmates, SGT D pushed appellant while he was standing with his arms and legs spread out to be searched. Appellant stumbled back, and SGT D pulled him upright. Sergeant D instructed appellant and the other inmates to make a painful noise when pushed. Appellant thought this was done to scare the other inmates. Second, on one occasion SGT D had appellant and fifteen other inmates strip naked after performing duties in the mess

hall. Sergeant D then searched their clothes and, while conducting a cavity check for contraband, had the inmates bend over and open their mouths. Third, on "at least a couple of occasions" while appellant was standing with his arms extended and his legs spread to be searched, SGT D grabbed the waistband of appellant's trousers and underwear and yanked them up, giving appellant "a forceful wedgie" that was "not exactly painful but very uncomfortable." Appellant said that every time he completed kitchen duty, he would be searched for contraband.

Appellant never complained to the USACFE authorities about the incidents because: (1) he did not want to get in trouble; (2) was afraid of more harassment if he complained; and (3) did not think that complaining "would change anything." Appellant submitted supporting affidavits from other inmates at the USACFE who alleged abuse by SGT D. The government concedes that appellant suffered cruel and unusual punishment by guards assigned at the USACFE, citing *United States v. Kinsch,* 54 M.J. 641 (Army Ct.Crim.App.2000), and its progeny. We accept the government's concession regarding the physical assaults upon appellant. Mindful of the fact that we granted relief to several other inmates who were physically abused more severely than appellant while confined at the USACFE, we will apply the factors set forth in *Kinsch,* 54 M.J. at 649, to fashion an appropriate remedy.

The findings of guilty are affirmed. After considering the entire record, the court affirms only so much of the sentence as provides for a dishonorable discharge, reduction to Private E1, forfeiture of all pay and allowances, and confinement for fifty-nine months and twenty-five days.

Senior Judge TOOMEY and Judge HARVEY concur.